**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

GEORGE ASSAD, Individually and on Behalf of All Others Similarly Situated,

     Plaintiff,

v.

STILLWATER MINING COMPANY,
BRIAN D. SCHWEITZER,
MICHAEL J. MCMULLEN,
GEORGE M. BEE,
PATRICE E. MERRIN,
LAWRENCE PETER O'HAGAN,
MICHAEL S. PARRETT,
GARY A. SUGAR,
SIBANYE GOLD LIMITED,
THOR US HOLDCO INC., and
THOR MERGCO INC.,

     Defendants.

---

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

---

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.    This action stems from a proposed transaction announced on December 9, 2016 (the "Proposed Transaction"), pursuant to which Stillwater Mining Company ("Stillwater" or the "Company") will be acquired by Sibanye Gold Limited ("Parent"), Thor US Holdco Inc. ("US

Holdco"), and Thor Mergco Inc. ("Merger Sub," and together with Parent and US Holdco, "Sibanye").

2.      On December 9, 2016, Stillwater's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement").  Pursuant to the terms of the Merger Agreement, shareholders of Stillwater will receive $18.00 per share in cash.

3.      On January 24, 2017, defendants filed a Preliminary Proxy Statement (the "Proxy Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4.      The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.  Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6.      This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Stillwater common stock.

9.      Defendant Stillwater is a Delaware corporation and maintains its principal executive office at 26 West Dry Creek Circle, Suite 400, Littleton, Colorado 80120.  Stillwater's common stock is traded on the NYSE under the ticker symbol "SWC."

10.      Defendant Brian D. Schweitzer ("Schweitzer") has served as a director and Chairman of the Board of Stillwater since May 2013.  According to the Company's website, Schweitzer is a member of the Corporate Governance & Nominating Committee and the Health, Safety & Environmental Committee.

11.      Defendant Michael J. McMullen ("McMullen") has served as a director of Stillwater since May 2013 and as President and Chief Executive Officer ("CEO") since December 2013.  According to the Company's website, McMullen is a member of the Health, Safety & Environmental Committee and the Technical and Ore Reserve Committee.

12.      Defendant George M. Bee ("Bee") has served as a director of Stillwater since November 2012.  According to the Company's website, Bee is Chair of the Health, Safety & Environmental Committee and a member of the Technical and Ore Reserve Committee.

13.      Defendant Patrice E. Merrin ("Merrin") has served as a director of Stillwater since May 2013.  According to the Company's website, Merrin is Chair of the Corporate Governance & Nominating Committee and a member of the Compensation Committee.

14.      Defendant Lawrence Peter O'Hagan ("O'Hagan") has served as a director of Stillwater March 2015.  According to the Company's website, O'Hagan is a member of the Audit Committee and the Compensation Committee.

15. Defendant Michael S. Parrett ("Parrett") has served as a director of Stillwater since May 2009. According to the Company's website, Parrett is Chair of the Audit Committee and a member of the Corporate Governance & Nominating Committee.

16. Defendant Gary A. Sugar ("Sugar") has served as a director of Stillwater since August 2012. According to the Company's website, Sugar is Chair of the Compensation Committee, Chair of the Technical and Ore Reserve Committee, and a member of the Audit Committee.

17. The defendants identified in paragraphs 10 through 16 are collectively referred to herein as the "Individual Defendants."

18. Defendant Parent is a public company organized under the laws of South Africa and a party to the Merger Agreement.

19. Defendant US Holdco is a Delaware corporation, an indirect wholly owned subsidiary of Parent, and a party to the Merger Agreement.

20. Defendant Merger Sub is a Delaware corporation, a direct wholly-owned subsidiary of US Holdco, and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

21. Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of Stillwater (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

22. This action is properly maintainable as a class action.

23. The Class is so numerous that joinder of all members is impracticable. As of December 6, 2016, there were approximately 121,080,187 shares of Stillwater common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout

the country.

24.     Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

25.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class.  Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

26.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

27.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

***Background of the Company***

28.     Stillwater is the only United States miner of platinum group metals ("PGMs") and the largest primary producer of PGMs outside of South Africa and the Russian Federation.

29.     The Company is engaged in the development, extraction, and processing of PGMs from a geological formation in south-central Montana recognized as the J-M Reef.  The J-M Reef is the only known significant source of PGMs in the United States and the highest-grade PGM deposit known in the world.

30.     The Company also recycles PGMs from spent catalytic converters and other industrial sources.

31.     The Company owns the Marathon PGM-copper deposit in Ontario, Canada, and the Altar porphyry copper-gold deposit located in the San Juan province of Argentina.

32.     On July 29, 2016, Stillwater issued a press release wherein it reported its financial results for the second quarter ended June 30, 2016.  The Company reported mined palladium and platinum sales of 150,900 ounces, an increase of 13.5% from 133,000 ounces sold during the second quarter of 2015, and mined palladium and platinum production of 137,100 ounces, an increase of 8.0% from 127,000 ounces mined during the second quarter of 2015.  Stillwater processed 169,900 ounces of recycled palladium, platinum, and rhodium, an increase of 12.1% over 151,600 ounces recycled during the second quarter of 2015 and is the second highest total on record.  Moreover, East Boulder Mine set several new records in the second quarter, including highest monthly tons milled (June), highest monthly ounces per employee (June), and the first half of 2016 was the highest number of ounces produced for any half-year period.  The Company also accelerated its Blitz project on the 56 East development drive, with first production now expected in late 2017 or early 2018.

33.     With respect to the results, Individual Defendant McMullen, President and CEO of the Company, commented:

> We are pleased to report not only strong operational performance this quarter, but also a notable 61.4% year-over-year reduction in our total company reportable

incident rate, reflecting our team's diligence in prioritizing safety while delivering improvement across the organization.

We delivered quarterly costs of metals sold of $501 per PGM mined ounce and AISC within our new medium-term mid-to-high $500's target range. Our momentum continued throughout the quarter, with June delivering the highest monthly ounces since April 2015, a significant decrease in costs of metals sold and the lowest AISC since 2010. We exit the first half of the year on track to exceed several of the original targets set for 2016, and thus today are announcing new guidance for the full-year. Our progress in results and safety represents an important milestone for the Company. I am confident that we now have the culture in place to continue safely increasing production while maintaining cost discipline.

The Company's liquidity position remains strong, with cash and cash equivalents plus highly liquid investments of $442.2 million at the end of the second quarter. The increase in purchased material in the recycling business during the second quarter, coupled with increasing metal prices, drove a $20.5 million build in working capital in the PGM Recycling segment. This shift was a significant factor in the overall reduction in cash and equivalents of $10.2 million from the first quarter of 2016. We continue to make solid progress in growing the recycling business, processing 169,900 PGM ounces during the quarter and achieving the second best quarter on record. In addition, we continue to invest in our mines through sustaining capital activities at a development rate above the schedule under our current mine plan.

34.     McMullen continued:

Work on the Blitz project continues to progress. Advance rates in the construction of the 56 East development heading, a critical path item for first production, continue to improve. Our focus on accelerating the project timeline has enabled us to bring forward plans for first production, which we now anticipate to occur in late 2017 or early 2018. Project spend on Blitz up to first production is now expected to be in the range of $155 million to $175 million. We anticipate Blitz will provide growth in our production profile and the Company's lowest cost mined ounces, given the grades shown by the drilling to date, as well as the logistical set up of the Blitz project.

Even as realized PGM prices saw a significant decline over the prior year period, recent improvements are encouraging. During the first half of 2016, platinum reversed its previous downward trend to reach $999 per ounce at the mid-year mark, and palladium rose from a low of $470 per ounce in the first quarter to $589 per mined ounce at the mid-year mark. At July 28, 2016, platinum traded at $1,143 per ounce and palladium had strengthened to $702 per ounce.

Overall, our solid second quarter performance and strong momentum in June

reflect the diligent focus of our team in continuing to drive costs lower and elevate safety across the organization. The fundamentals of palladium, our primary product, remain strong, and we are confident that our disciplined approach to capital deployment and focus on operational efficiencies position Stillwater to benefit across all stages of the commodity cycle.

35.     On October 28, 2016, Stillwater issued a press release wherein it reported its financial results for the third quarter ended September 30, 2016.  The Company reported PGM mined sales of 131,800 ounces, an increase of 12.4% from 117,300 ounces sold during the third quarter of 2015, and PGM mined production of 138,800 ounces, an increase of 8.4% from 128,100 PGM mined ounces during the third quarter of 2015.  The Company processed 175,000 ounces of recycled palladium, platinum, and rhodium, an increase of 8.7% over 161,000 ounces recycled during the third quarter of 2015 and a Company record.  The Company further reported consolidated net income attributable to common stockholders of $12.6 million or $0.10 per diluted share, compared to a consolidated net loss attributable to common stockholders of $11.9 million or $0.10 per diluted share for the third quarter of 2015.

36.     With respect to the results, Individual Defendant McMullen commented:

The third quarter 2016 results demonstrate that Stillwater Mining Company continues to deliver on operational plans and stated objectives. Our efforts to grow the recycling business have been successful as we processed 175,000 ounces of recycled PGMs during the third quarter of 2016, which was a Company record. Mined production and costs were in-line with our expectations. Based on our year-to-date results and future outlook, we remain confident in our ability to achieve the improved full-year guidance targets provided last quarter. . . .

The Company remains focused on Blitz, our primary growth project. The progress on the two critical path items to first production, the 56 East development heading and the 53 East decline is ahead of plan. In addition, considerable engineering work has been updated on the Blitz project. This new work has driven a substantial increase to the scope of the project with relatively minimal additional costs. As a result of the new work performed, the project now incorporates the lower Blitz area. We now anticipate that Blitz will add between 270,000 and 330,000 ounces of mine production annually when fully ramped up by 2021-2022. This is anticipated to be all incremental production for at least the first decade of the Blitz production phase. Costs for the project are expected to

increase to approximately $250 million from the previous $205 million estimate, which we consider to be a small escalation given the much expanded scope of the project and the acceleration of the production profile. Additional capital will be required for expansion of the Stillwater Mine concentrator to treat the increased ore tonnage and the related work is currently underway.

37.     McMullen concluded:

The third quarter provides another data point for the evaluation of the progress we are making at Stillwater. As the business continues to evolve, we have consistently reached our performance targets, while achieving record safety results. I believe we have successfully established a foundation of financial discipline and focus on continuous operational improvement that will allow our shareholders to benefit from the world-class mining and processing assets we possess along with robust PGM market fundamentals. I would like to thank our team for the hard work to achieve the success Stillwater has experienced to date and the continued efforts for future progress.

***The Inadequate Proposed Transaction and Preclusive Merger Agreement***

38.     The Board caused the Company to enter into the Merger Agreement, pursuant to which the Company will be acquired for inadequate consideration.

39.     The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.   Section 6.2.1 of the Merger Agreement states:

Except as expressly permitted by this Section 6.2, during the Pre-Closing Period, the Company shall not, and shall cause its Subsidiaries and Representatives and its and their directors, officers and employees and other Representatives not to, directly or indirectly through another Person, (i) initiate, solicit or knowingly take any action to encourage, or knowingly facilitate the submission or making of, any Acquisition Proposal, or any inquiry, expression of interest, proposal, offer or request for information that could reasonably be expected to lead to or result in an Acquisition Proposal, (ii) other than informing Third Parties of the existence of the provisions contained in this Section 6.2 or (for a period of no more than two Business Days), in response to an unsolicited Acquisition Proposal or solely to the

extent reasonably necessary to ascertain facts from the Person making such Acquisition Proposal for the purpose of providing the Company Board with sufficient information about such Acquisition Proposal and the Person that made it, participate or engage in negotiations or discussions with, or furnish any information concerning the Company or any of its Subsidiaries to, any Third Party relating to an Acquisition Proposal or any inquiry, expression of interest, proposal, offer or request for information that could reasonably be expected to lead to or result in an Acquisition Proposal, (iii) enter into any Contract (written or oral) relating to an Acquisition Proposal, or (iv) resolve or agree to do any of the foregoing. From and after the execution and delivery of this Agreement, the Company shall, and shall cause its Subsidiaries and its and their respective Representatives to, (A) immediately cease and cause to be terminated all discussions or negotiations with any Person that may be ongoing and existing on the date hereof with respect to any Acquisition Proposal, or any inquiry, expression of interest, proposal, offer or request for information that could reasonably be expected to lead to or result in an Acquisition Proposal, (B) terminate access by any Third Party to any physical or electronic data room or other access to data or information of the Company, in each case relating to or in connection with, any Acquisition Proposal or any potential Acquisition Transaction, (C) request the prompt return or destruction of all information previously provided to any Third Party in connection with any inquiry, expression of interest, proposal, offer or request for information that could reasonably be expected to lead to or result in an Acquisition Proposal or a proposed Acquisition Transaction, and (D) use reasonable best efforts to enforce, and not waive or modify, the provisions of any existing confidentiality or non-disclosure Contract entered into with respect to any Acquisition Proposal or any potential Acquisition Transaction; provided, however, that the Company shall waive standstill provisions therein to the extent such provisions prohibit or limit any Third Party from requesting that such provisions be waived or modified in connection with the submission or possible submission of an Acquisition Proposal in accordance with this Section 6.2. The Company shall ensure that its Representatives and the Representatives of its Subsidiaries are aware of the provisions of this Section 6.2, and it is agreed that any violation of the restrictions set forth in this Section 6.2 by any Representative of the Company or any of its Subsidiaries shall constitute a breach of this Section 6.2 by the Company.

40.     Further, the Company must promptly advise Sibanye of any proposals or inquiries

received from other parties.  Section 6.2.3 of the Merger Agreement states:

The Company shall promptly (and in no event later than 24 hours after receipt by the Company) notify Parent (which notice shall be provided orally and in writing and shall identify the Person making the Acquisition Proposal and set forth in reasonable detail the material terms thereof) after receipt of any Acquisition Proposal, and shall promptly (and in no event later than 24 hours after receipt by the Company) provide copies to Parent of any written proposals or indications of

interest with respect to any Acquisition Proposal, and/or draft agreements relating to any Acquisition Proposal. Without limiting the foregoing, the Company shall keep Parent informed of any developments (including the status of discussions or negotiations) regarding any Acquisition Proposal (including by promptly (and in no event later than 24 hours after receipt by the Company) providing to Parent copies of any additional or revised written proposals or indications of interest with respect to such Acquisition Proposal, and/or draft agreements relating to such Acquisition Proposal) on a reasonably prompt basis (and in any event within 24 hours after receipt by the Company). The Company agrees that it and its Subsidiaries will not enter into any Contract with any Third Party subsequent to the date of this Agreement that prohibits the Company from providing any information to Parent in accordance with this Section 6.2.3.

41.     Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Sibanye a "matching right" with respect to any "Superior Proposal" made to the Company.  Section 6.2.4 of the Merger Agreement provides, in relevant part:

In addition, and without limiting this Section 6.2.4, at any time after the date of this Agreement and prior to the time, but not after, the Company Stockholder Approval is obtained, if the Company Board determines, in good faith, after consultation with its outside legal counsel and outside independent financial advisors, that a written Acquisition Proposal made after the date hereof that did not result from a breach of this Section 6.2 constitutes a Superior Proposal, then the Company Board may, subject to compliance with this Section 6.2.4, make a Company Adverse Recommendation Change; provided, that prior to making a Company Adverse Recommendation Change, the Company shall have provided Parent five Business Days' prior written notice ("Superior Proposal Notice") advising Parent that it intends to take such action and specifying, in reasonable detail, the reasons for such action and the terms and conditions of any such Superior Proposal, including the identity of the Third Party who has made such Superior Proposal, and provided Parent a copy of the relevant proposed Alternative Acquisition Agreement or the latest draft thereof or, if no such agreement or draft exists, a written summary of the material terms and conditions of such Superior Proposal, and any other related available documentation and correspondence relating to such Superior Proposal (including any related financing commitments and fee letters), and:

(A) during such five Business Day period, if requested by Parent, the Company shall have engaged in good faith negotiations with Parent (and the Company shall have directed its Representatives, including, its outside legal counsel and outside

independent financial advisors, to have engaged in good faith negotiations with Parent and its Representatives) regarding changes to the terms of this Agreement intended to cause such Acquisition Proposal to no longer constitute a Superior Proposal; and

(B) the Company shall have considered the Proposed Changed Terms proposed by Parent no later than 11:59 p.m., NY time, on the fifth Business Day of such five-Business Day period and shall have determined in good faith (after consultation with its outside legal counsel and outside independent financial advisors) that the Superior Proposal would continue to constitute a Superior Proposal if such Proposed Changed Terms were to be given effect and that the failure to make a Company Adverse Recommendation Change would be inconsistent with the Company Board's fiduciary duties to the stockholders of the Company under Applicable Law.

The Parties acknowledge and agree that any (1) revisions to the financial or any other material terms of a Superior Proposal or (2) revisions to the financial terms or any other material terms of an Acquisition Proposal that the Company Board had determined no longer constitutes a Superior Proposal, shall constitute a new Acquisition Proposal and shall in each case require the Company to deliver to Parent a new Superior Proposal Notice and a new period (which period shall be three Business Days) shall commence thereafter, during which time the Company shall be required to comply with the requirements of this Section 6.2.4 anew with respect to such additional notice.

42.     Further locking up control of the Company in favor of Sibanye, the Merger Agreement provides for a "termination fee" of $16.5 million, payable by the Company to Sibanye if the Individual Defendants cause the Company to terminate the Merger Agreement. Stillwater also may be required to reimburse Sibanye's expenses up to $10 million.

43.     By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

44.     The consideration to be paid to plaintiff and the Class in the Proposed Transaction is inadequate.

45.     Among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

46.     The merger consideration also fails to adequately compensate the Company's stockholders for the significant synergies resulting from the merger.

47.     Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

***The Proxy Statement Omits Material Information, Rendering It False and Misleading***

48.     Defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction.

49.     The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.

50.     First, the Proxy Statement omits material information regarding Stillwater's financial projections and the financial analyses performed by the Company's financial advisor, Merrill Lynch, Pierce, Fenner & Smith Incorporated ("BofA Merrill Lynch"), in support of its so-called fairness opinion.

51.     For example, with respect to Stillwater's financial projections, the Proxy Statement fails to disclose:  (i) all of the projection line items for Stillwater for each year of the projection period as provided by management and/or relied upon by BofA Merrill Lynch in its financial analyses, including but not limited to annual production rates for each separate product, assumed pricing for each product for each year, and operating expenses; (ii) the definition of unlevered free cash flow; (iii) each of the constituent line items used in the calculation of unlevered free cash flow, including for each of the Stillwater Mine, Blitz project, East Boulder Mine, and Lower East Boulder project; and (iv) a reconciliation of GAAP to non-GAAP metrics.

52.     With respect to BofA Merrill Lynch's *Net Asset Value Analysis*, the Proxy

Statement fails to disclose:  (i) the specific inputs and assumptions used to determine the discount rate range of 11.6% to 14.5%; and (ii) the separate concluded values for each of the Stillwater Mine, Blitz project, East Boulder Mine, and Lower East Boulder project, as well as the values for cash, the market value of Stillwater's convertible debentures as of December 7, 2016, mine closure liabilities, and the value of Altar Resources, as used by BofA Merrill Lynch in this analysis.

53.     With respect to BofA Merrill Lynch's *Selected Publicly Traded Companies Analysis*, the Proxy Statement fails to disclose the individual multiples for the companies observed by BofA Merrill Lynch in its analysis, as well as the separately concluded values for Stillwater and Altar Resources.

54.     With respect to BofA Merrill Lynch's *Selected Precedent Transactions Analysis*, the Proxy Statement fails to disclose the individual multiples for the transactions observed by BofA Merrill Lynch in its analysis, as well as the separately concluded values for Stillwater and Altar Resources.

55.     When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.  Moreover, the disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

56.     The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement:  (i) "Opinion of

14

Stillwater's Financial Advisor"; (ii) "Certain Stillwater Unaudited Prospective Financial Information"; (iii) "Reasons for the Merger; Recommendation of the Stillwater Board of Directors"; and (iv) "Background of the Merger."

57.     Second, the Proxy Statement omits material information regarding potential conflicts of interest of the Company's officers and directors.

58.     Specifically, the Proxy Statement fails to disclose the timing and nature of all communications regarding future employment and/or directorship of Stillwater's officers and directors, including who participated in all such communications.

59.     Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders.  This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

60.     Additionally, the Proxy Statement fails to disclose the amount of compensation the Company's officers and directors are estimated to receive in connection with the Proposed Transaction.

61.     The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Interests of the Company's Directors and Executive Officers in the Merger"; (ii) "Reasons for the Merger; Recommendation of the Stillwater Board of Directors"; and (iii) "Background of the Merger."

62.     Third, the Proxy Statement omits material information regarding potential conflicts of interest of BofA Merrill Lynch.

63.     Specifically, the Proxy Statement fails to disclose whether BofA Merrill Lynch has provided past services to Stillwater and/or its affiliates, as well as the amount of compensation received by BofA Merrill Lynch for such services.

64.     Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

65.     The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement:  (i) "Opinion of Stillwater's Financial Advisor"; (ii) "Reasons for the Merger; Recommendation of the Stillwater Board of Directors"; and (iii) "Background of the Merger."

66.     Fourth, the Proxy Statement omits material information regarding the background of the Proposed Transaction.  The Company's stockholders are entitled to an accurate description of the "process" the directors used in coming to their decision to support the Proposed Transaction.

67.     For example, the Proxy Statement fails to disclose whether the confidentiality agreements entered into between Stillwater and the potential bidders, including Company B, Company C, and Company D, contained standstill and/or "don't ask, don't waive" provisions.

68.     The Proxy Statement further fails to disclose the nature of the "preliminary discussions with representatives of third parties regarding possible sales by Stillwater of non-core assets."

69.     The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement:  (i) "Reasons for the Merger; Recommendation of the Stillwater Board of Directors"; and (ii) "Background of the

Merger."

70.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to Stillwater's stockholders.

## COUNT I

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and Stillwater**

71.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

72.     The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.  Stillwater is liable as the issuer of these statements.

73.     The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

74.     The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

75.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

76.     The Proxy Statement is an essential link in causing plaintiff and the Company's

stockholders to approve the Proposed Transaction.

77.     By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

78.     Because of the false and misleading statements in the Proxy Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and Sibanye

79.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

80.     The Individual Defendants and Sibanye acted as controlling persons of Stillwater within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Stillwater and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

81.     Each of the Individual Defendants and Sibanye was provided with or had unlimited access to copies of the Proxy Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

82.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.   The Proxy Statement contains the unanimous

recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly in the making of the Proxy Statement.

83.     Sibanye also had direct supervisory control over the composition of the Proxy Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy Statement.

84.     By virtue of the foregoing, the Individual Defendants and Sibanye violated Section 20(a) of the 1934 Act.

85.     As set forth above, the Individual Defendants and Sibanye had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.     In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.     Directing the Individual Defendants to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.     Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as

well as Rule 14a-9 promulgated thereunder;

      E.      Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

      F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

DATE: January 27, 2017           Respectfully submitted,

                    */s/ Rusty E. Glenn*
                    Rusty E. Glenn
                    **THE SHUMAN LAW FIRM**
                    600 17th Street, Suite 2800 South
                    Denver, CO 80202
                    Telephone: (303) 861-3003
                    Facsimile: (303) 536-7849
                    Email: rusty@shumanlawfirm.com

                    Kip B. Shuman
                    **THE SHUMAN LAW FIRM**
                    Post-Montgomery Ctr.
                    One Montgomery Street, Ste. 1800
                    San Francisco, CA 94104
                    Telephone: (303) 861-3003
                    Facsimile: (303) 536-7849
                    Email: kip@shumanlawfirm.com

                    *Local Counsel for Plaintiff*

                    **RIGRODSKY & LONG, P.A.**
                    Seth D. Rigrodsky
                    Brian D. Long
                    Gina M. Serra
                    Jeremy J. Riley
                    2 Righter Parkway, Suite 120
                    Wilmington, DE 19803
                    (302) 295-5310

**RM LAW, P.C.**
Richard A. Maniskas
995 Old Eagle School Road, Suite 311
Wayne, PA 19087
(484) 588-5516

*Attorneys for Plaintiff*

## CERTIFICATION OF PLAINTIFF

I, GEORGE ASSAD ("Plaintiff"), hereby declare as to the claims asserted under the federal securities laws that:

1. Plaintiff has reviewed the complaint and authorizes its filing.

2. Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3. Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, and I will testify at deposition or trial, if necessary. I understand that this is not a claim form and that I do not need to execute this Certification to share in any recovery as a member of the class.

4. Plaintiff's purchase and sale transactions in the Stillwater Mining Company (NYSE: SWC) security that is the subject of this action during the class period is/are as follows:

<table>
<tr><td colspan="3">PURCHASES</td><td colspan="3">SALES</td></tr>
<tr><td>Buy Date</td><td>Shares</td><td>Price per Shares</td><td>Sell Date</td><td>Shares</td><td>Price per Shares</td></tr>
<tr><td>12/18/13</td><td>205</td><td>11.70</td><td></td><td></td><td></td></tr>
<tr><td></td><td></td><td></td><td></td><td></td><td></td></tr>
<tr><td></td><td></td><td></td><td></td><td></td><td></td></tr>
<tr><td></td><td></td><td></td><td></td><td></td><td></td></tr>
</table>

*Please list additional transactions on separate sheet of paper, if necessary.*

5. Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including Plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6.      During the three years prior to the date of this Certification, Plaintiff has not moved to serve as a representative party for a class in an action filed under the federal securities laws.

7.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___ day of January, 2017.

_____
George Assad